700 So.2d 670 (1997)
Marbel MENDOZA, Appellant,
v.
STATE of Florida, Appellee.
No. 84370.
Supreme Court of Florida.
October 16, 1997.
Rehearing Denied December 11, 1997.
*672 John H. Lipinski, of the Law Offices of John H. Lipinski, Miami, for Appellant.
Robert A. Butterworth, Attorney General and Randall Sutton, Assistant Attorney General, Miami, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing a death sentence upon Marbel Mendoza. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm.
Appellant asked Humberto Cuellar to participate in robbing Conrado Calderon, who owned a mini-market. Humberto asked his brother, Lazaro Cuellar, to act as the getaway driver. The three men observed Calderon's morning routine at his house in Hialeah. Then, before dawn on the morning of March 17, 1992, the three drove to Calderon's house where they stopped and waited. When Calderon appeared at his front door at 5:40 a.m., Humberto and appellant hid behind a hedge. Appellant carried a .38 caliber revolver, and Humberto carried a 9 mm automatic pistol. As Calderon left his house and approached his Ford Bronco, Humberto and appellant approached Calderon from the rear and held him in Calderon's driveway between his Ford and Cadillac automobiles. During the ensuing struggle, Humberto used his gun to hit Calderon on the head. Calderon took out a .38 special revolver and shot Humberto in the chest. The injured Humberto ran to Lazaro's car. As he ran, Humberto heard other shots. Less than a minute later, appellant arrived at Lazaro's car and told Humberto that appellant had shot Calderon. No money was taken. The three drove to a hospital in Hialeah. On the way, appellant told Humberto to say that Humberto had been shot by someone who had robbed him.
At the hospital, police recovered Lazaro's car containing Humberto's 9 mm automatic pistol. The pistol was still fully loaded and had hair embedded in the slide, which was consistent with the gun having been used to hit someone on the head. The same day, Humberto was taken to the Hialeah Police Station, where he gave a sworn statement that matched his later testimony for the State. When appellant was arrested on March 24, 1992, he had shaved his head and moved out of his normal residence. Items recovered from the scene included a bank bag, which was under the victim and contained $2,089, and other cash which was in Calderon's pockets and wallet. Appellant's fingerprints were found on Calderon's Cadillac, adjacent to where Calderon's body was found. Calderon's gun was found under his body. Casings and bullets were recovered from the scene and from the victim's body. An x-ray of Humberto showed that the bullet lodged near his spine was consistent with Calderon's .38 special. Three of the four .38 caliber shots that hit Calderon were fired from point-blank range, and the last was fired from less than six inches away.
Lazaro Cuellar pled guilty to manslaughter, conspiracy, and attempted armed robbery and was sentenced to ten years in state prison. He did not testify at appellant's trial. Humberto Cuellar pled guilty to second-degree murder, conspiracy, attempted *673 armed robbery, burglary, and use of a firearm in the commission of a felony. He was sentenced to twenty years in state prison. Humberto testified as an eyewitness for the State at appellant's trial. Appellant was convicted of first-degree murder, conspiracy to commit robbery, attempted armed robbery, armed burglary with an assault, and possession of a firearm during the commission of a felony. By a seven-to-five vote, the jury recommended the death penalty. The court imposed a sentence of death after finding the following aggravating factors: (1) appellant was previously convicted of a violent felony; and (2) the murder was committed while appellant was engaged in the commission of a robbery and for pecuniary gain (merger of aggravators). The court considered the mitigating evidence presented but found no mitigating circumstances after giving little weight to appellant's alleged drug use and minimal weight to his mental health claims as nonstatutory mitigation. Appellant appeals his first-degree murder conviction and sentence of death, raising nine issues.[1]
Appellant first claims that the evidence presented at trial was insufficient to convict him for burglary as an underlying felony of his felony-murder conviction. He argues that no proof of burglary was presented because appellant never entered an enclosed area of Calderon's property which would qualify as a curtilage and subject appellant to a burglary charge under section 810.02, Florida Statutes (1991). We do not decide whether the State proved the elements of burglary because the State proved beyond a reasonable doubt that appellant committed the underlying felony of attempted armed robbery. In Kearse v. State, 662 So.2d 677 (Fla.1995), we held that any failure to prove the underlying felony of escape was harmless beyond a reasonable doubt in light of the evidence establishing felony murder based on the underlying felony of robbery. Id. at 682. Similarly, proof of appellant's underlying felony of attempted armed robbery is sufficient to support his felony murder conviction.
Next, appellant argues that the trial court erred in granting the State's request to admit as substantive evidence the prior sworn statement of eyewitness Humberto Cuellar after the defense used selected parts of Humberto's prior statement in attempting to impeach his trial testimony. We disagree. When one party presents part of a prior written or recorded statement, an adverse party may have the remainder of the statement introduced into evidence in the interest of fairness. § 90.108, Fla. Stat. (1991). This rule is known as the "doctrine of completeness," and its purpose is to avoid the potential for creating misleading impressions by taking statements out of context. Larzelere v. State, 676 So.2d 394, 401 (Fla.1996). Such determination of fairness falls within the discretion of the trial judge and is not to be disturbed absent an abuse of discretion. Id. at 402. Our review of the record reveals no abuse of discretion in the trial court's admission of the prior sworn statement of Humberto Cuellar. During the trial, defense counsel attempted to impeach Humberto's testimony by asking him about alleged inconsistent statements Humberto made as part of his overall sworn statement to police after the murder of Calderon on March 17, 1992, the day of the crime. The State informed the trial court that defense counsel's reading of random parts of the statement was likely *674 to leave the jury with the mistaken impression that Humberto's prior sworn statement differed substantially from his trial testimony. The trial court then admitted the previous sworn statement insofar as it was consistent with the trial testimony. Under the circumstances, the prior statement was admissible under section 90.108, Florida Statutes (1991). Accordingly, we find no error in the trial court's admission of the prior statement.
As to his third issue, appellant argues that the trial court erred in denying his motion for mistrial following the court's out-of-court communications with jurors. The basis of this claim is the following comment by the court to the attorneys during the State's presentation of its case:
THE COURT: The state is taking the witness outside. J.R. mentioned about the communication, and I was thinking that I should have mentioned to all of the lawyers, when I was having lunch the jurors sat down about two tables away from me. One juror said, "Why aren't we allowed to ask questions?"
I simply told them if they have any questions to write them down at the end of the trial to see if they can be answered. I told them if they had any questions during the trial in terms of things that they should know that they should write them down, like I told them here in court.
Additionally, one juror gave me two shots of Cuban coffee and asked me if I wanted it with my lunch.
I am telling you these things because they happened at lunch and you should be aware so it doesn't come out later, something about an ex parte communication.
Thirdly, one juror said do I have any opinion on the Tonya Harding case, and I said, "You have to be fair and impartial and you have to wait until you hear everything."
Other than that, I read my newspaper and ate my lunch.
I just wanted you to be aware that that occurred.
First, we point out that this communication does not fall within the scope of Florida Rule of Criminal Procedure 3.410, which provides that if, after the jury retires to consider the verdict, the jurors request additional instructions, such instructions shall be given only after notice to the prosecuting attorney and to counsel for defendant. Fla. R.Crim. P. 3.410. See Hitchcock v. State, 413 So.2d 741, 744 (Fla.1982). These comments were made during the type of normal encounter between a judge and a jury which is likely to occur during a trial recess. In the courthouse in which this trial took place, the dining area is necessarily used by both the judge and jurors during a trial. Thus, the judge and jurors cannot avoid encountering one another outside the courtroom. It would be unrealistic and wrong for us to instruct a judge not to respond at all to jurors who ask questions during such encounters. Rather, we expect a judge to respond to jurors with no more than minimal, courteous answers. In this case, the record of the judge's response reflects exactly the course we would expect a trial judge to take. The judge replied as succinctly and as innocuously as common courtesy permitted under the circumstances. Shortly thereafter, the court put the encounter into the record so that the parties and the reviewing court would be aware of what had occurred. Accordingly, we find no error.
Finally, even if we considered the judge's comments to be error, communications outside the express notice requirements of rule 3.410 should be analyzed using harmless-error principles. Williams v. State, 488 So.2d 62, 64 (Fla.1986). We find harmless in this case any error in the judge's responding to jurors during a lunch break by courteously indicating a constraint upon engaging in conversation. The court correctly informed the parties in open court of the brief exchange with jurors and allowed the parties an opportunity to object on the record. Thus, any error in the judge's brief communication with jurors was harmless.
The next issue concerns appellant's contention that the trial court erred in denying challenges for cause to prospective jurors based on their beliefs about the death penalty. At the close of voir dire, appellant accepted the jury with one unused peremptory challenge remaining. For there to be reversible *675 error based upon the denial of a challenge for cause, an appellant must have exhausted all peremptory challenges and identified an objectionable juror who had to be accepted and who sat on the jury. Trotter v. State, 576 So.2d 691, 692-93 (Fla.1990); Pentecost v. State, 545 So.2d 861, 863 n. 1 (Fla.1989). Appellant is unable to meet this test and thus has failed to establish this claim.
Furthermore, even if this procedural bar did not exist, it is within the trial court's province to determine whether a challenge for cause is proper, and the trial court's determination of juror competency will not be overturned absent manifest error. Foster v. State, 679 So.2d 747, 752 (Fla.1996); Castro v. State, 644 So.2d 987, 989 (Fla.1994). None of the three prospective jurors to whom appellant points on appeal gave answers indicating that he or she would fail to follow the judge's instructions or would apply the death penalty automatically. See Farina v. State, 680 So.2d 392, 398 (Fla.1996); Walls v. State, 641 So.2d 381, 386 (Fla.1994); Penn v. State, 574 So.2d 1079, 1080 (Fla.1991). A trial court has latitude in ruling upon a challenge for cause because the court has a better vantage point from which to evaluate prospective jurors' answers than does this Court in our review of the cold record. We find no manifest error by the trial court.
In his fifth issue, appellant claims error in the trial court's exclusion of an application for political asylum which defense counsel attempted to introduce through appellant's mother, who testified during the penalty phase. Appellant argues that the application should have been admitted to corroborate his mother's testimony about his childhood. We have recognized that hearsay evidence may be admissible in a penalty-phase proceeding if there is an opportunity to rebut. Lawrence v. State, 691 So.2d 1068 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 205, ___ L.Ed.2d ___ (1997); see also § 921.141(1), Fla. Stat. (1991). We find that this asylum application could not be admitted because there was no opportunity to rebut it. The preparer of the application was not identified. The record shows that the application was submitted to the United States Immigration and Naturalization Service but not that any official action was taken concerning it. On the basis of this record, we find that this document was merely a self-serving statement filed in the public records. We find no error in the trial court's refusal to admit the application. Even if the document had been admitted, it would have been cumulative because of the testimony of appellant's mother concerning his childhood. Thus, any error in respect to the denial of the admission would be harmless beyond a reasonable doubt.
As to his sixth issue, appellant claims that the trial court erred in failing to sustain appellant's objection and in failing to grant a mistrial after the State elicited from appellant's expert the fact that appellant had pending criminal charges and also commented on the pending charges during closing argument. This claim involves the testimony of Dr. Jethro Toomer, a psychologist engaged on behalf of appellant to perform mental-status functioning testing and to give psychological testimony. On direct examination, Dr. Toomer testified that as part of his evaluation he obtained from appellant a psychosocial history, which he defined as follows:
That is a process of or series of questions being administered that also allow for the individual to provide input at his or her own discretion with regards to overall functioning, place of birth, demographic data, information regarding childhood, parental relations, sibling relationship, prior medical history, prior areas of problems or difficulty.
In other words, it's a life history of the individual's functioning from earlier on up to that point.
Those are some of the areas that we attempt to gather information regarding.
Dr. Toomer thereafter testified:
Q. Dr. Toomer, can Marbel Mendoza be rehabilitated?
A. I think that given his history and given what I saw and as I indicated I did not find anything indicative of anti-social personality disorder, I believe that he can.
Upon cross-examination, the State inquired concerning the history which Dr. Toomer *676 used as a basis for his opinion that appellant could be rehabilitated:
Q.....
Doctor, after reviewing the defendant's history you concluded and I believe this came out on direct by Mr. Wax, you concluded that you believe based on reviewing the defendant's history that he could be rehabilitated; correct?
A. Yes.
Q. In formulating this opinion did you review the circumstances and facts of the defendant[`s] pending cases?
MR. WAX [defense attorney]. Objection.
THE COURT: Overruled.
MR. WAX: I have a motion I'd like to reserve.
THE COURT: I have reserved your right.
THE WITNESS: I'm speaking on his history. That's based on my evaluation of him and what I found as a result of my evaluation.
THE COURT: That doesn't answer the question.
THE WITNESS: Why don't you repeat the question.
BY MR. PERIKLES [assistant state attorney]:
Q. Did you review the defendant's pending cases in coming to your conclusion, yes or no?
MR. WAX: Same objection.
THE WITNESS: No, I didn't.
THE COURT: You have a continuing objection.
MR. WAX: I have to make it even if we agree it's [a] continuing one.
Q: Were you aware that the defendant has a pending trial in other robberies
MR. WAX: Objection.
Q. using a firearm[?].
THE COURT: Overruled.
MR. WAX: I have an objection.
BY MR. PERIKLES:
Q. Were you aware of that?
A. I was aware of other cases. That other charges were pending against the individual, yes, Mr. Mendoza.
Q. That has no impact on your assessment today that the defendant can be rehabilitated.
A. I answered your question. I said to you that conclusion was based upon my evaluation of the subject and what I found based upon the mental status evaluation that I conducted.
In its penalty-phase closing argument, the State argued:
Perhaps the most interesting part of Dr. Toomer's testimony was the last question the defense attorney asked him, which was, "Can the defendant be rehabilitated," because that's what you are all thinking about. It is natural to think about it. It is natural every time you see something on TV or a story in the newspaper. You think about someone who has been in prison for a long time and when they get out they can be a changed person. It is natural to think about what could have become of their lives.
Again, as I said to you in the beginning, I am not making this as an emotional plea. We have to look at the facts.
What did Dr. Toomer answer?
"Can this defendant be rehabilitated?"
Dr. Toomer said, "Given his history" and, remember this is an expert"Given his history, he can be."
Then what happened?
Then he was subject to cross examination. Mr. Perikles asked him, "You've considered his history, Dr. Toomer?" And the doctor said, "Yes."
"Did you consider his history?"
And his answer was, "Well, I didn't consider that he was convicted of a robbery last year because either I didn't know about it"he didn't consider it even though that was part of his history.
"Did you consider the fact that he is in jail awaiting other robberies"
MR. WAX: Objection.
THE COURT: Consistent with my ruling, I am going to overrule the objection.

*677 Ladies and gentlemen, please remember that the defendant is presumed innocent on those charges and that was utilized in the course of the trial solely for the purposes of impeaching the doctor. It is not an aggravating circumstance, that he may have pending charges.
MR. WAX: May we reserve a motion?
THE COURT: Yes, sir.
MS. SEFF [assistant state attorney]: Did the doctor, who is an expert, look at anything about this guy? Nothing. He knew nothing about him, knew nothing about his history. He knows nothing about anything bad that he has done, about his life and activities. He only knows what the defendant has told him and that he is a hired gun.
He testifies to you to try and convince you in his expert opinion that this defendant can be rehabilitated and that he has severe emotional problems and a severe drug problem, so perhaps somehow that is an aggravating factor, that all those things mitigate what he did; that is, to Mr. [Calderon], to Mr. [Robert] Street.
Appellant contends that the overruling of the objections to testimony concerning pending charges was an error because of our decisions in Robinson v. State, 487 So.2d 1040 (Fla.1986), Dougan v. State, 470 So.2d 697 (Fla.1985), and Perry v. State, 395 So.2d 170 (Fla.1980). We do not find those cases applicable here because those cases centered upon whether arrests without conviction could be offered to the jury as a basis for the aggravator of previous convictions of a violent felony. Nor do we find Geralds v. State, 601 So.2d 1157 (Fla.1992), to be on point. Rather, we find that this issue is controlled by our decision in Hildwin v. State, 531 So.2d 124 (Fla. 1988), in which we stated:
Because no conviction was obtained, evidence such as that introduced in the instant case has been deemed inadmissible to prove the aggravating circumstance of committing a previous violent felony. On the other hand, even where the defendant waived the mitigating circumstance of no prior criminal activity, the state was allowed to bring out the defendant's prior misconduct when the defendant opened the door by introducing evidence of his nonviolent character. We hold that, during the penalty phase of a capital case, the state may rebut defense evidence of the defendant's nonviolent nature by means of direct evidence of specific acts of violence committed by the defendant provided, however, that in the absence of conviction for any such acts, the jury shall not be told of any arrests or criminal charges arising therefrom.

531 So.2d at 128 (citations omitted) (emphasis added).
We followed Hildwin with Valle v. State, 581 So.2d 40 (Fla.1991), in which we stated:
In this case, the defense presented expert opinions that the defendant would be a good prisoner. Under the rationale of Hildwin, it is clear that the state could introduce rebuttal evidence of specific prior acts of prison misconduct and violence. Here, however, the defense experts had formed their opinions from Valle's prison records, including reports of the incidents explored on cross-examination. Valle's experts also used his criminal records as a basis for their opinions, including the transcript from the probation revocation hearing that dealt with the incident where Valle attempted to run over the police officer. Therefore, it was proper to cross-examine the experts concerning these incidents.
581 So.2d at 46 (footnote omitted).
Based upon these decisions, we conclude that it was proper to cross-examine Dr. Toomer as to his knowledge of appellant's involvement in other robberies. However, the trial court erred in overruling appellant's objection to the State's question to Dr. Toomer during cross-examination and the comment in the State's closing argument asking whether Dr. Toomer was aware that the defendant had a pending trial in other robberies using a firearm. This violated our prohibition against telling the jury of any *678 arrests or criminal charges arising from specific bad acts. Hildwin, 531 So.2d at 127.
We have found that erroneously admitted evidence concerning a defendant's character in a penalty phase is subject to a harmless error review under State v. DiGuilio, 491 So.2d 1129 (Fla.1986). See Peterka v. State, 640 So.2d 59, 70 (Fla.1994). We have reviewed the record as to whether the error in permitting the question which referred to the "pending trial in other robberies" and "using a firearm" in the cross-examination of Dr. Toomer and the argument by the State which repeated that question were harmless beyond a reasonable doubt. We have determined that the question and statement concerning the pending charges were isolated rather than emphasized and were not the focus of either the cross-examination or the argument. The focus of both the cross-examination and the State's argument was properly upon the extent of Dr. Toomer's knowledge of appellant's history of "prior areas of problems or difficulty," upon which Dr. Toomer testified on direct examination that he had relied in forming his opinion that appellant could be rehabilitated. Furthermore, in contrast to this isolated reference to the pending trial for other robberies, the jury heard live testimony from a witness named Robert Street, who testified that he had been the victim of a robbery. Evidence was presented that on April 16, 1993, appellant was convicted in connection with that same robbery of charges of robbery with a firearm, aggravated battery, burglary of a conveyance with a firearm, and use of a firearm in the commission of a felony. Mr. Street identified appellant as the person who had the gun and who participated in beating him during the commission of those crimes. It was the convictions for armed robbery and possession of a firearm in the commission of a felony in the robbery and the beating of Mr. Street which the trial court used as the basis for the prior violent felony aggravator. The test for harmless error is whether there is a reasonable possibility that the error affected the verdict. DeGuilio. We conclude on the basis of this record that there is no reasonable possibility that the isolated references to the pending charges affected appellant's sentence of death, and therefore the error was harmless beyond a reasonable doubt.[2]
In his next claim, appellant argues that the trial court erred in the penalty phase by finding that appellant committed the murder of Calderon for pecuniary gain. We find no merit in this argument. The State proved that appellant's entire episode involving Calderon was motivated by the prospect of pecuniary gain. See Allen v. State, 662 So.2d 323, 330 (Fla.1995). In addition, the trial court properly instructed the jury to merge the pecuniary-gain aggravating factor with the factor of commission during an attempted robbery, and the sentencing order merged the two aggravating circumstances. We find no error related to this claim.
Appellant also argues that the trial court erred in its sentencing order by inadequately considering appellant's proposed mitigation. Our review of the record and the trial court's sentencing order indicates that the trial court properly considered and weighed the proffered mitigation evidence. The weight assigned to a mitigating circumstance is within the trial court's discretion and is subject to the abuse of discretion standard. Blanco v. State, 22 Fla. L. Weekly S570 (Fla. Sept. 18, 1997). We believe the trial court followed the requirements of Campbell v. State, 571 So.2d 415 (Fla.1990). Therefore, we find no merit in this contention.
Finally, we consider whether the death sentence is proportionate in this case. Appellant argues that the death penalty is disproportionate here because the murder *679 took place during a robbery and the shooting of Calderon was a reflexive action in response to Calderon's resistance to the robbery. Appellant cites three robbery-murder cases to support his contention that this crime does not warrant the death penalty because the murder was not planned but was committed on the spur of the moment during a robbery gone awry. See Terry v. State, 668 So.2d 954 (Fla.1996); Jackson v. State, 575 So.2d 181 (Fla.1991); Livingston v. State, 565 So.2d 1288 (Fla.1988). We find no merit in this argument. In Terry and Jackson, as in this case, the trial court found two aggravating circumstances and no mitigating circumstances in imposing the death penalty. In both of those cases, we vacated the death sentences on proportionality grounds. However, in Terry and Jackson, the trial courts based prior-violent-felony aggravating circumstances upon armed robberies which were contemporaneous with the murders. By contrast, the trial court in this case based the prior-violent-felony circumstance upon appellant's previous armed robbery conviction in the Robert Street case. Thus, appellant's prior conviction of an entirely separate violent crime differs from the aggravation found in Terry and Jackson. In Livingston, the trial court found two mitigating circumstances: Livingston's age (seventeen years) and Livingston's unfortunate home life and upbringing. By contrast, appellant was twenty-five years old at the time of this murder, and the trial court considered but found no mitigation in the form of appellant's history of drug use and mental problems. Therefore, under the circumstances of this case, the death penalty is not disproportionate.
Accordingly, we affirm appellant's convictions and death sentence.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion.
ANSTEAD, Justice, concurring in part and dissenting in part.
I cannot agree with the majority's conclusions on the issues of proportionality or that the murder was "committed for pecuniary gain."
In order to apply the statutory aggravator of a killing committed for pecuniary gain, it must be established by proof beyond a reasonable doubt that the killing was actually done to facilitate the taking of money or other thing of value. Stated another way, it must be shown that "the primary motive for this killing was pecuniary gain." See Scull v. State, 533 So.2d 1137, 1142 (Fla.1988) ("While it is true that Scull took Villegas' car following the murder, it has not been shown beyond a reasonable doubt that the primary motive for this killing was pecuniary gain."); Simmons v. State, 419 So.2d 316, 318 (Fla. 1982) ("There was not, however, sufficient evidence to prove a pecuniary motivation for the murder itself beyond a reasonable doubt. Such proof cannot be supplied by inference from circumstances unless the evidence is inconsistent with any reasonable hypothesis other than the existence of the aggravating circumstance."); Clark v. State, 609 So.2d 513, 515 (Fla.1992) ("To establish this aggravator, the State must prove a pecuniary motivation for the murder.")
It is apparent that the shooting of the victim here was in response to the victim's own attempts to shoot the appellant and his codefendant, and not to facilitate the taking of the victim's money or property. In other words, the appellant did not kill the victim in order to take his money. The victim managed to fire three (3) shots at the appellant and his codefendant, Cuellar. In response, the appellant shot the victim and fled, completely abandoning the robbery attempt. All of the shots were fired at or into the victim's body, and no shots were fired at or into the victim's head. The appellant took no money from the victim and, in fact, thousands of dollars in cash was left untouched at the scene. In short, the victim was not shot in order to allow the appellant to seize the victim's money or property, rather, the victim was shot in immediate retaliation for trying to lawfully defend himself by firing at *680 the appellant and his codefendant. The motive was retaliation, not robbery.
Further, I cannot conclude that this shooting during a "robbery gone bad" fits into the category of the most aggravated and least mitigated murders for which the death penalty has been reserved. See State v. Dixon, 283 So.2d 1 (Fla.1973). This was an unplanned, reactive murder that took place unexpectedly in a matter of seconds in a shootout initiated by the victim. Under similar circumstances involving the deaths of victims during robberies, we have mandated life sentences. See Terry v. State, 668 So.2d 954 (Fla.1996); Sinclair v. State, 657 So.2d 1138 (Fla.1995); Thompson v. State, 647 So.2d 824 (Fla.1994). Further, as the majority notes, the two codefendants, both equally responsible for planning and carrying out this robbery gone bad, received markedly less punishment, one sentenced to ten years for manslaughter and the other to twenty years for second-degree murder. In fact, it was the codefendant Cuellar who initiated the violence against the victim that in turn prompted the victim's attempt to shoot his assailants.
NOTES
[1] Appellant raises the following claims: (1) the evidence presented was not sufficient to convict appellant for burglary as an underlying crime in the felony murder conviction; (2) the trial court erred in allowing the State to introduce as substantive evidence the sworn prior consistent statement of Humberto Cuellar; (3) the trial court erred in denying appellant's motion for mistrial based on the judge's ex parte communications with jurors; (4) the trial court erred in denying three challenges for cause to prospective jurors based on their beliefs concerning the death penalty; (5) the trial court erred during the penalty phase in excluding mitigation evidence; (6) the trial court erred in allowing the State to impeach appellant's expert witness by asking him whether he had considered appellant's criminal history and in allowing the State to comment during closing argument on appellant's pending criminal charges; (7) the trial court erred in finding as an aggravating circumstance that the murder was committed for pecuniary gain; (8) the trial court erred in failing to adequately address in the sentencing order appellant's proposed mitigation; and (9) the death penalty is not proportionally warranted in this case.
[2] Additionally, we note if we were to remand appellant's case for a new sentencing hearing, the State would be entitled to introduce as aggravating factors appellant's subsequent guilty pleas and sentences in four other cases for multiple counts of robbery, aggravated battery, kidnapping, and firearms offenses. See Finney v. State, 660 So.2d 674, 682 (Fla.1995); Craig v. State, 510 So.2d 857, 868 (Fla.1987); Oats v. State, 446 So.2d 90, 95 (Fla.1984).